Filed 11/24/25

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| MIKE DENNIS,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>MONSANTO COMPANY,<br><br>　　Defendant and Appellant. | D084130<br><br><br>(Super. Ct. No. 37-2021-00047326-CU-PO-NC) |


APPEAL from a judgment of the Superior Court of San Diego County, Kevin A. Enright, Judge.  Affirmed.

Bryan Cave Leighton Paisner, K. Lee Marshall, Jean-Claude André and Andrew E. Tauber for Defendant and Appellant.

Kiesel Law, Paul R. Kiesel and Melanie M. Palmer; Ehrlich Law Firm and Jeffrey I. Ehrlich; Law Offices of Clinton Ehrlich and Clinton E. Ehrlich; Clark, Love & Hutson, Scott A. Love, Adam Peavy and Jason M. Milne for Plaintiff and Respondent.

Mike Dennis was diagnosed with mycosis fungoides, a form of non-Hodgkin's lymphoma (NHL), after using Roundup, an herbicide manufactured and sold by Monsanto Company (Monsanto), monthly for approximately 20 years.  Dennis sued Monsanto and alleged, among other claims, that they failed to warn consumers that using Roundup in accordance with widespread and common practice presented a substantial danger.  The

jury found Monsanto liable and awarded Dennis $7 million in economic damages and $325 million in punitive damages. The trial court granted Monsanto's motion for judgment notwithstanding the verdict (JNOV) in part and reduced the punitive damages to $21 million.

Monsanto appeals and asserts the trial court erred by failing to conclude Dennis's failure to warn claims were preempted by the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.) (FIFRA), and by failing to conclude that the punitive damages award violated due process by punishing Monsanto multiple times for the same conduct. We find no error and affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the operative first amended complaint, Dennis alleged that he applied Roundup around his home property on a monthly basis, throughout the year, every year from 2000 until 2020.

Roundup is a "non-selective herbicide used to kill weeds." Its main ingredient is glyphosate, which was discovered by Monsanto in 1970. In 2015, the International Agency for Research on Cancer, an agency of the World Health Organization, classified glyphosate as a Group 2A herbicide, meaning that it is probably carcinogenic to humans. The agency found that NHL is among the cancers most associated with exposure to glyphosate. Roundup also contains other ingredients that increases absorption of the active ingredient, glyphosate, into both plant leaves and human skin.

Dennis was diagnosed with mycosis fungoides, a form of NHL, in June 2020. Dennis alleged that his diagnosis was the direct and proximate result of his exposure to Roundup. He alleged further that Monsanto continued marketing and selling the product despite knowing that it carried a risk of causing NHL and without providing adequate warning to consumers.

2

Dennis asserted causes of action for design defect, failure to warn (negligent and strict liability), and negligence against Monsanto. As to the failure to warn causes of action, the jury made the following findings on a directed verdict form:

– Roundup has a risk of causing NHL that was known or knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of Monsanto's manufacture, distribution, or sale.

– The potential risks of Roundup present a substantial danger to persons when used in accordance with widespread and commonly recognized practice.

– Ordinary customers would not have recognized that potential risk.

– Monsanto knew or should reasonably have known that Roundup can cause or was likely to cause NHL when used in accordance with widespread and commonly recognized practice.

– Monsanto knew or should reasonably have known that users would not realize that danger.

– Monsanto failed to adequately warn of the potential risks or danger and failed to adequately instruct on the safe use of Roundup.

– A reasonable manufacturer, distributor, or seller under the same or similar circumstances would have warned of the danger or instructed on the safe use of Roundup.

– The lack of sufficient warnings was a substantial factor in causing Mike Dennis's mycosis fungoides.

In addition, the jury found that Monsanto "engage[d] in conduct with malice, oppression or fraud committed by one or more officers, directors or managing agents of Monsanto acting on behalf of Monsanto."

3

Based on those findings, the jury awarded Dennis $2 million in past noneconomic losses, $5 million in future noneconomic losses, and $325 million in punitive damages.

Monsanto filed motions for a new trial and JNOV. As relevant to the present appeal, Monsanto asserted that FIFRA expressly and impliedly preempted Dennis's failure to warn claims, and that the punitive damages award must be set aside because it violated due process by punishing Monsanto multiple times for the same conduct and because the ratio of the punitive to compensatory damages was excessive.

The trial court found that the award of $325 million in punitive damages lacked a sufficiently reasonable relationship to the compensatory damages of $7 million. Accordingly, the court reduced the punitive damages award to $21 million. The court rejected Monsanto's remaining arguments and entered an amended judgment adjusting the punitive damages award.

Monsanto filed a timely notice of appeal.

## II. DISCUSSION

Monsanto does not dispute the jury's verdict or its associated findings in this appeal. Monsanto raises two distinct legal arguments: 1) FIFRA preempts Dennis's failure to warn claims brought under California law; and 2) the punitive damages award, as adjusted, still violates due process by punishing Monsanto multiple times for the same conduct. We address each in turn.

### A. FIFRA Does Not Preempt Dennis's Failure to Warn Claims

We first consider whether FIFRA preempts California state failure to warn claims arising from allegedly inadequate warnings regarding health risks associated with pesticides registered and labeled under FIFRA.

4

### 1. Federal Preemption

A state law, based either in statute or common law, can be preempted by the supremacy clause of the United States Constitution in one of two ways: by express preemption or implied preemption. (*Pilliod v. Monsanto Co.* (2021) 67 Cal.App.5th 591, 613 (*Pilliod*); *American Meat Institute v. Leeman* (2009) 180 Cal.App.4th 728, 745–746 (*Leeman*).)

Express preemption occurs " 'when Congress "define[s] explicitly the extent to which its enactments pre-empt state law;" ' " for example, by including express language in the federal statute. (*Pilliod, supra,* 67 Cal.App.5th at p. 613.)

Implied preemption occurs "when state law 'regulates conduct in a field that Congress intended the Federal Government to occupy exclusively,' " and when state law " ' "actually conflicts with federal law," ' " either because " ' "it is impossible to comply with both state and federal law" ' " or because " ' "the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." ' " (*Leeman, supra,* 180 Cal.App.4th at p. 746.) Preemption that arises because it is impossible to comply with both state and federal law is sometimes referred to as " 'impossibility preemption.' " (*Pilliod, supra,* 67 Cal.App.5th at p. 613.)

"Federal preemption of state law is a question of law that we review de novo." (*Pilliod, supra,* 67 Cal.App.5th at p. 614.)

### 2. *Bates v. Dow Agrosciences LLC*

In *Bates v. Dow Agrosciences LLC* (2005) 544 U.S. 431 (*Bates*), the United States Supreme Court considered whether, and to what extent, FIFRA preempts state law failure to warn claims, albeit in a slightly different context.

5

In *Bates*, a group of Texas farmers alleged that Dow failed to adequately warn them that its pesticide, "Strongarm," would stunt the growth of peanuts in soil with a pH level of 7.0 or greater. (*Bates, supra,* 544 U.S. at pp. 434–435.) Dow had conditionally registered Strongarm in March 2000 with a label that stated: " 'Use of Strongarm is recommended in all areas where peanuts are grown.' " (*Id.* at p. 435.) However, the next year, after the plaintiff farmers had already used it on their peanut crops, Dow reregistered Strongarm with a supplemental label for specific states, including Texas, that read " 'Do not apply Strongarm to soils with a pH of 7.2 or greater.' " (*Ibid.*) The farmers alleged they applied Strongarm with the original label, that it did extensive damage to their crops, and that Dow failed to warn them of this known risk. (*Id.* at pp. 435–436.)

The trial court dismissed the farmers' claims, finding they were preempted by 7 U.S.C. § 136v(b), a provision of FIFRA that provides, "States [regulating pesticides] shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." (*Bates, supra,* 544 U.S. at p. 436.) The appellate court affirmed, highlighting a conflict amongst various state courts, and the United States Supreme Court granted certiorari to address the scope of federal preemption based on FIFRA. (*Bates,* at p. 437.)

The Supreme Court began with a brief history of state and federal pesticide regulations. (*Bates, supra,* 544 U.S. at p. 437.) "Prior to 1910 the States provided the primary and possibly the exclusive source of regulatory control over the distribution of poisonous substances." (*Ibid.*) The federal government entered the field through the Insecticide Act of 1910, followed by the original enactment of FIFRA in 1947, both of which delt primarily with licensing and labeling. (*Bates,* at p. 437.) FIFRA initially required all

6

pesticides sold in interstate commerce to be registered with the Secretary of Agriculture. (*Bates,* at p. 437.) The Environmental Protection Agency (EPA) took over the registration process in 1970. (*Ibid.*)

"[S]purred by growing environmental and safety concerns, Congress adopted the extensive amendments" that transformed FIFRA into a more comprehensive regulatory scheme in 1972. (*Bates, supra,* 544 U.S. at p. 437.) Under the more comprehensive FIFRA, "a manufacturer seeking to register a pesticide must submit a proposed label to EPA as well as certain supporting data. 7 U.S.C. §§ 136a(c)(1)(C), (F). The [EPA] will register the pesticide if it determines that the pesticide is efficacious (with the caveat discussed below), § 136a(c)(5)(A); that it will not cause unreasonable adverse effects on humans and the environment, §§ 136a(c)(5)(C), (D); 136(bb); and that its label complies with the statute's prohibition on misbranding, § 136a(c)(5)(B); 40 CFR § 152.112(f)."[1] (*Bates*, at p. 438.)

"A pesticide is 'misbranded' if its label contains a statement that is 'false or misleading in any particular.' " (*Bates*, *supra*, 544 U.S. at p. 438.) "A pesticide is also misbranded if its label does not contain adequate instructions for use, or if its label omits necessary warnings or cautionary statements. 7 U.S.C. §§ 136(q)(1)(F), (G)." (*Ibid.*) That includes warnings adequate to protect health. (7 U.S.C. § 136(q)(1)(G).)

"Because it is unlawful under [FIFRA] to sell a pesticide that is registered but nevertheless misbranded, manufacturers have a continuing obligation to adhere to FIFRA's labeling requirements." (*Bates*, *supra*, 544 U.S. at p. 438.) As part of this ongoing obligation, manufacturers also have a

---

1    As was particularly relevant in *Bates*, the EPA effectively stopped evaluating pesticide efficacy to allow a greater focus on environmental and health risks in the 1970's. (*Bates, supra,* 544 U.S. at p. 440.)

duty to report incidents of toxic effects not adequately reflected on a pesticide's label.  (*Id.* at p. 439.)  In response, the EPA may institute cancellation proceedings or other enforcement actions.  (*Ibid.*)

Registration serves as prima facie evidence that a pesticide is not misbranded, but it is not a defense to misbranding.  FIFRA states:  "In no event shall registration of an article be construed as a defense for the commission of any offense under this subchapter.  As long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of the subchapter."  (7 U.S.C. § 136a(f)(2).)

FIFRA also expressly allows states to continue their own regulatory efforts.  (*Bates*, *supra*, 544 U.S. at p. 439.)  FIFRA addresses the authority of the states in 7 U.S.C. section 136v, which provides:  "A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter."  (*Id.,* § 136v(a).)  However, "[s]uch State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter."  (*Id.,* § 136v(b).)

Thus, as the *Bates* court concluded, FIFRA is not " 'sufficiently comprehensive' " to raise an inference that " 'Congress ha[s] occupied the field to the exclusion of the States.' "  (*Bates, supra,* 544 U.S. at pp. 441–442.)  Rather, the statute " 'leaves ample room for States and localities to supplement federal efforts.' "  (*Id.* at p. 442.)  "As a part of their supplementary role, States have ample authority to review pesticide labels to ensure that they comply with both federal and state labeling requirements."  (*Ibid.*)  "Nothing in the text of FIFRA would prevent a State from making the

violation of a federal labeling or packaging requirement a state offense, thereby imposing its own sanctions on pesticide manufacturers who violate federal law." (*Ibid.*)

With that background in mind, the *Bates* court turned to the question of whether the claims at issue there were preempted by 7 U.S.C section 136v(b). (*Bates, supra,* 544 U.S. at p. 442.) The court explained that certain state rules *could* be preempted by 7 U.S.C section 136v(b), but for preemption to occur, two conditions must be met. (*Bates,* at pp. 443–444.) "First, [the state law or rule] must be a requirement '*for labeling or packaging*'; rules governing the design of a product, for example, are not pre-empted. Second, it must impose a labeling or packaging requirement that is '*in addition to or different from* those required under this subchapter.' A state regulation requiring the word 'poison' to appear in red letters, for instance, would not be pre-empted if an EPA regulation imposed the same requirement." (*Id.* at p. 444.)

Addressing the claims at issue in *Bates*, the court explained: "It is perfectly clear that many of the common-law rules upon which petitioners rely do not satisfy the first condition. Rules that require manufacturers to design reasonably safe products, to use due care in conducting appropriate testing of their products, to market products free of manufacturing defects, and to honor their express warranties or other contractual commitments plainly do not qualify as requirements for 'labeling or packaging.' None of these common-law rules requires that manufacturers label or package their products in any particular way. Thus, petitioners' claims for defective design, defective manufacture, negligent testing, and breach of express warranty [were] not pre-empted." (*Bates, supra,* 544 U.S. at p. 444.)

As to claims regarding the express warranty on the Strongarm label, the court explained, "a cause of action on an express warranty asks only that a manufacturer make good on the contractual commitment that it voluntarily undertook by placing that warranty on its product." (*Bates, supra,* 544 U.S. at p. 444.) The express warranty claims did not require Dow to make a warranty in the first instance, or to say anything specific therein, and therefore did not impose a requirement for " 'labeling or packaging.' " (*Id*. at p. 445.) In rejecting the appellate court's "effects-based test," the *Bates* court explained that a "requirement is a rule of law that must be obeyed; an event, such as a jury verdict, that merely motivates an optional decision is not a requirement." (*Ibid*.)

The court found the fraud and negligent failure to warn claims were, however, "premised on common-law rules that qualify as 'requirements for labeling or packaging.' " (*Bates, supra,* 544 U.S. at p. 446.) Thus, for those claims, the court had to consider "whether [the] particular common-law duties [were] equivalent to FIFRA's misbranding standards." (*Id*. at p. 447.)

In addressing that question, the *Bates* court adopted a "parallel requirement" reading of 7 U.S.C section 136v(b). (*Bates, supra,* 544 U.S. at p. 447.) It found that 7 U.S.C section 136v(b) gives states the "right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements.' " (*Bates,* at p. 447.) It explained that where state and federal labeling requirements parallel one another, states are imposing additional *remedies*, not additional *requirements.* (*Id*. at p. 448.)

Finally, the court concluded: "To be sure, the threat of a damages remedy will give manufacturers an additional cause to comply, but the requirements imposed on them under state and federal law do not differ."

(*Bates, supra,* 544 U.S. at p. 448.) That conclusion was consistent with the "long history of tort litigation against manufacturers of poisonous substances [which] adds force to the basic presumption against pre-emption." (*Id.* at p. 449.)

### 3. *Pilliod* Is Instructive Here

In *Pilliod*, our sister court relied on the analysis in *Bates* to analyze whether the plaintiffs' failure to warn and design defect claims, similar to the ones at issue here, were preempted by FIFRA. (*Pilliod, supra,* 67 Cal.App.5th at p. 615.)

Like the plaintiff here, husband and wife, Alberta and Alva Pilliod, each developed NHL after using Roundup. (*Pilliod, supra,* 67 Cal.App.5th at p. 600.) A jury found in favor of the Pilliods and awarded them compensatory and punitive damages. (*Ibid.*) On appeal, Monsanto asserted the Pilliods' failure to warn and design defect claims were preempted because they were based on state law labeling and packaging requirements that are "in addition to" and "different from" requirements imposed by FIFRA. (*Pilliod,* at p. 615.) The court rejected Monsanto's assertion, concluding instead that Monsanto had identified "no state law requirements that are in addition to or different from the misbranding requirements imposed by FIFRA." (*Ibid.*)

As the *Pilliod* court explained, "To prove negligent failure to warn under California law, a plaintiff must show 'that a manufacturer . . . did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about.' " (*Pilliod, supra,* 67 Cal.App.5th at p. 615.) "To prove failure to warn in strict liability, a plaintiff must show 'that the defendant did not adequately warn of a particular risk that was known or knowable in light of

11

the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution.' " (*Ibid*.)

Similarly, a pesticide is misbranded under FIFRA "if its labeling 'does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with . . . are adequate to protect health' (7 U.S.C. § 136(q)(1)(F)) or if its label 'does not contain a warning or caution statement which may be necessary and if complied with . . . is adequate to protect health.' (7 U.S.C. § 136(q)(1)(G).)" (*Pilliod, supra,* 67 Cal.App.5th at p. 616.) As the *Pilliod* court held, "California common law therefore does not impose any requirements that are different from or in addition to the requirements of FIFRA." (*Ibid*.)

The *Pilliod* court also rejected Monsanto's argument, like the argument raised in this appeal, that any state law requirement for a cancer warning would be preempted because the EPA had reviewed the factual basis for the label statements that were included on the product. (*Pilliod, supra,* 67 Cal.App.5th at p. 616.) The court found Monsanto's argument "disregard[ed] the provision in FIFRA that registration and approval of a label is not a defense to a claim of misbranding," and "ignore[d] the explication in *Bates* that 'FIFRA contemplates that pesticide labels will evolve over time, as manufacturers gain more information about their products' performance in diverse settings,' and the observation that 'tort suits can serve as a catalyst in this process.' " (*Ibid*.)

As both courts explained: " ' "By encouraging plaintiffs to bring suit for injuries not previously recognized as traceable to pesticides such as [the pesticide there at issue], a state tort action of the kind under review may aid in the exposure of new dangers associated with pesticides. Successful actions of this sort may lead manufacturers to petition [the] EPA to allow more

12

detailed labelling of their products; alternatively, [the] EPA itself may decide that revised labels are required in light of the new information that has been brought to its attention through common law suits. In addition, the specter of damage actions may provide manufacturers with added dynamic incentives to continue to keep abreast of all possible injuries stemming from use of their product so as to forestall such actions through product improvement." ' " (*Pilliod, supra,* 67 Cal.App.5th at p. 616.)

In *Pilliod*, Monsanto also asserted that the state law claims were subject to impossibility preemption[2] because Monsanto could not change the Roundup label without EPA approval. (*Pilliod, supra,* 67 Cal.App.5th at p. 616.) But the *Pilliod* court was "not persuaded that the doctrine [(i.e., impossibility preemption)] can be reconciled with FIFRA, which confirms that states are authorized to regulate the sale and use of pesticides and authorizes states to ban the sale of a pesticide that it finds unsafe." (*Id.* at p. 617.) Accordingly, the *Pilliod* court found that FIFRA did not preempt the Pilliods' claims, either expressly or impliedly. (*Pilliod,* at p. 618.)

We find the *Pilliod* case persuasive and directly applicable to the arguments raised by Monsanto in this appeal. Dennis's failure to warn claims are like those at issue in *Pilliod*. And, notably here, Monsanto does not dispute the factual findings of the jury, including findings that there is a risk that Roundup may cause NHL, and that Monsanto knew or should have known about that risk.

Monsanto asserts Dennis cannot identify any statutory or regulatory provision that requires Monsanto to warn that glyphosate is a carcinogen,

---

2    As noted, *ante*, impossibility preemption is generally used to describe implied preemption that arises because it is impossible to comply with both state and federal law. (*Pilliod, supra,* 67 Cal.App.5th at p. 613.)

13

but of course this assertion completely overlooks the well-established fact that Roundup is impermissibly misbranded under FIFRA if its label omits necessary warnings or cautionary statements to protect health. (*Bates*, *supra*, 544 U.S. at p. 438; 7 U.S.C. §§ 136(q)(1)(F), (G).) Likewise, it also overlooks the fact that Monsanto had an ongoing duty under FIFRA to report incidents of toxic effects not adequately reflected on a pesticide's label. (*Bates*, at p. 438.) To the extent that Monsanto effectively concedes that it knew or should reasonably have known that Roundup can cause NHL when used in accordance with widespread and commonly recognized practice, it had an obligation under FIFRA to report any known incidents and seek an amended label from the EPA. There is no evidence in the record before us that it did so.[3]

Monsanto continues to rely on the fact that the EPA has never *required* it to put a cancer warning on Roundup, but as the *Pilliod* court explained, that argument "disregards the provision in FIFRA that registration and approval of a label is not a defense to a claim of misbranding." (*Pilliod, supra,* 67 Cal.App.5th at p. 616.) To the extent Monsanto asserts the EPA did not *allow* it to place a cancer warning on the Roundup label, Monsanto mischaracterizes the regulatory process. The EPA has never said Monsanto could *not* put a cancer warning on the Roundup label; and, indeed, Monsanto has never asked the EPA to permit such a label. Instead, Monsanto has consistently presented evidence to the EPA disputing the connection between

_____

3      We hereby grant Monsanto's unopposed request to take judicial notice filed on February 10, 2025. We deny Monsanto's request to take judicial notice filed on June 24, 2025 as the documents were not before the trial court and are not necessary for the resolution of the appeal. (See *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3; *Guarantee Forklift, Inc. v. Capacity of Texas, Inc.* (2017) 11 Cal.App.5th 1066, 1075).

Roundup and NHL and, thus, the EPA has not *required* the warning. Significantly, here, Dennis presented evidence that Monsanto acted maliciously in misrepresenting the science to the EPA, and it appears the jury and the trial court agreed. Thus, the mere fact that the EPA approved a label for Roundup that does not contain a cancer warning does not establish that Roundup was not misbranded because it did not include a warning necessary to protect health. (7 U.S.C. §136(q)(1)(F); *Pilliod, supra,* 67 Cal.App.5th at p. 616.)

As explained in *Bates*, 7 U.S.C section 136v strikes a balance between the regulatory efforts of the states and the federal government and allows states to provide *remedies* for mislabeling violations so long as the relevant cause of action parallels FIFRA's labeling requirements. (*Bates, supra,* 544 U.S. at pp. 447–448.) Where, as here, the cause of action does not impose different or additional requirements, state tort suits can serve as a catalyst for manufacturers, like Monsanto, to provide additional information to the EPA and may aid in exposure of new dangers. (*Pilliod, supra,* 67 Cal.App.5th at p. 616.) That Monsanto has continually disputed the connection between Roundup and NHL before the EPA does not support a finding that the underlying state and federal requirements are different. At most, it supports an inference that Monsanto has thus far convinced the EPA (perhaps using nonobjective data) to maintain a different conclusion regarding the applicability or impact of certain parallel requirements to the Roundup product.

Monsanto asserts further that there is clear evidence the EPA would not have approved a cancer warning for Roundup, and therefore any state requirement to do so must be preempted. But, as we have explained, the EPA's previous decision not to *require* a cancer warning on glyphosate

pesticides like Roundup—based in part based on studies and arguments put forth by Monsanto—does not equate to evidence that the EPA would not *allow* a warning if Monsanto expressly sought (or supported) one for Roundup. Moreover, the EPA decisions that Monsanto points to relate generally to pesticides with the active ingredient glyphosate, and not to Monsanto's specific formula for Roundup.[4]

Here, the trial court found that Dennis presented evidence of "Monsanto's responses to scientific studies . . . and potential reclassification by regulatory agencies." That "evidence demonstrated not only the failure of Monsanto to adequately investigate the risk, but active efforts to limit research and shape scientific discourse regarding the risk." And, from that evidence, the jury could infer that "any limitation in the available knowledge of the risk was the result of Monsanto's efforts to suppress it, or at minimum to limit discourse and further investigation." Monsanto does not address, or dispute, these findings.

The trial court then concluded that *Pilliod* was directly on point, binding, and not distinguishable on the facts. Although not technically binding on this court, we agree and likewise follow the reasoning set forth in *Pilliod*. (*The MEGA Life & Health Insurance Co. v. Superior Court* (2009) 172 Cal.App.4th 1522, 1529 [Although not bound by the decision of sister Courts of Appeal, we ordinarily follow them based on principles of stare decisis, absent good reason to disagree].)

---

4    Monsanto relies on a 2019 letter from the EPA informing manufacturers that it would consider products including "the Proposition 65 warning language based on chemical glyphosate" to be misbranded. As Monsanto concedes, the EPA has since stated it could approve a labeling change if pesticide registrants requested it.

16

### 4. We Are Not Persuaded by *Schaffner*

Monsanto urges this court to follow *Schaffner v. Monsanto Corp.* (2024) 113 F.4th 364 (*Schaffner*), a recent decision from the Third Circuit that departs from the reasoning in *Pilliod*. We have considered *Schaffner* but find it unpersuasive and therefore decline to follow it.

Like this case and *Pilliod*, the Schaffners alleged Monsanto violated Pennsylvania law by failing to include a cancer warning on Roundup, and Monsanto asserted their claims were preempted by FIFRA. (*Schaffner, supra,* 113 F.4th at p. 371.) The *Schaffner* court found that because the EPA approved a label for Roundup that omitted a cancer warning, any state law duty to warn about cancer and Roundup was different than the requirements imposed under FIFRA, and, thus, was preempted. (*Schaffner* at p. 371.)

In reaching that conclusion, the *Schaffner* court acknowledged that FIFRA "directly prohibits the distribution of pesticides whose labels fail to include warnings necessary to protect human health." (*Schaffner, supra,* 113 F.4th at p. 372.) The court also acknowledged that FIFRA requires manufacturers to inform the EPA if it learns of new information concerning a pesticide's risk after registration, and that it allows manufacturers to apply for an amended registration. (*Schaffner,* at pp. 373–374.) Finally, the *Schaffner* court acknowledged that the Ninth and Eleventh Circuits rejected Monsanto's preemption argument in *Hardeman v. Monsanto Co.* (2021) 997 F.3d 41 and *Carson v. Monsanto Co.* (2024) 92 F.4th 980, respectively. (*Schaffner,* at p. 374.)

The *Schaffner* court declined to follow the previous cases and elected to "develop the law of express preemption under FIFRA" itself. (*Schaffner, supra,* 113 F.4th at p. 379.) The court proceeded in "three steps." (*Id.* at p. 381.) First, it concluded "that the Preapproval Regulation, 40 C.F.R.

17

§ 152.44, prohibited Monsanto from modifying Roundup's Preapproved Label in order to add the Cancer Warning," at least without seeking an amended approval. (*Ibid.*) Second, it concluded "the Preapproval Regulation establishes a 'requirement' for the purposes of preemption." (*Ibid.*) And third, it addressed the parallel-requirements test and concluded the Pennsylvania requirement was different because it allegedly required a cancer warning that was omitted from Roundup's preapproved label "and could not have been added to the Roundup label without violating the Preapproval Regulation." (*Id.* at pp. 381–382.)

In doing so, the *Schaffner* court acknowledged that Monsanto had never submitted an amended registration seeking to add a cancer warning, and that "a plaintiff might conceivably argue that FIFRA required Monsanto to submit such an application and that a state-law claim for breach of duty to warn could satisfy the parallel-requirements test because it is equivalent to that federal requirement [for amended registration]." (*Schaffner, supra,* 113 F.4th at p. 386, fn. 13.) The *Schaffner* court declined to address the argument because the Schaffners had not explicitly raised it. (*Ibid.*)

In our view, overlooking this argument rendered the *Schaffner* court's analysis incomplete. Even if the Schaffners had not expressly asserted that Monsanto could have, but did not, seek an amended registration, it remains that both the ongoing duty and the ability to amend a registration are necessary components of FIFRA's regulatory scheme, and thus also necessary to the evaluation of whether the state and federal requirements are parallel. As the United States Supreme Court explained in *Bates*—which is binding on this court and the Third Circuit—FIFRA expressly permits states " 'to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements,' " and such tort suits can

18

serve as a catalyst for the labeling process. (*Bates, supra,* 544 U.S. at pp. 447, 451.)  Here, as in *Pilliod,* the verdict does not impose a requirement that Monsanto include a cancer warning; rather, it enforces the parallel requirement that Monsanto include all warnings necessary to protect health and, in doing so, could serve to incentivize Monsanto to provide accurate reporting to the EPA and/or file an amended application seeking a cancer warning for Roundup.  (See *Bates,* at p. 451.)

Similarly, the *Schaffner* court continually, and in our view, incorrectly, characterized an approved label that omits a certain warning as *requiring* such omission.[5]  (See, e.g., *Schaffner, supra,* 113 F.4th at p. 385 [EPA "prohibited" Monsanto from adding a cancer warning].)  That view "disregards the provision in FIFRA that registration and approval of a label is not a defense to a claim of misbranding," and "ignores the explication in *Bates* that 'FIFRA contemplates that pesticide labels will evolve over time, as manufacturers gain more information about their products' performance in diverse settings,' and the observation that 'tort suits can serve as a catalyst in this process.' " (*Pilliod, supra,* 67 Cal.App.5th at p. 616.)  Accordingly, we reject that analysis.  (*Caranci v. Monsanto Co.* (2025) 338 A.3d 151, 170 (*Caranci*) ["The holding in *Schaffner* implies that EPA's approval of a label is final and determinative that the label adequately warns of risks.  We reject this implication.  FIFRA provides that EPA approval merely creates a rebuttable presumption of compliance with FIFRA."].)

---

5      Addressing the plaintiffs' arguments, the *Schaffner* court agrees that "EPA registration cannot be 'dispositive of FIFRA compliance,' " but then goes on to conclude that registration "affects the content of the requirements imposed under FIFRA, as registration determines what label the pesticide must bear." (*Schaffner, supra,* 113 F.4th at p. 397.)  In our view, this is a distinction without meaning.

Monsanto asserts that the *Schaffner* court's reading is correct because deriving a duty to warn (i.e., requiring Monsanto to place a cancer warning on Roundup) from FIFRA's misbranding provisions would violate the rule against surplusage. It points to the following implementing regulations as more specific than the misbranding regulations: 1) "When data or other information show that an acute hazard may exist to humans or domestic animals, the label must bear precautionary statements," (40 C.F.R. § 156.70(b) (2025)); 2) "Specific statements pertaining to the hazards of the product and its uses must be approved by the Agency" (*id.,* § 156.70(c)); and 3) "A registrant may distribute or sell a registered product with the composition, packaging and labeling currently approved by the Agency." (*Id.,* § 152.130(a).) And, Monsanto asserts further, based on these same provisions, that the alternate reading in *Pilliod* impermissibly places the "general" misbranding provision over these more specific labeling requirements.

But none of the regulations Monsanto points to change the fact that an approved label serves only as prima facie evidence, and not a defense to mislabeling. Nor do they preclude a manufacturer like Monsanto from providing relevant data to the EPA and asking it to approve a label that includes a warning label. Rather, these provisions demonstrate the parallel nature of the FIFRA regulations and California state common law failure to warn claims like those at issue here. FIFRA requires pesticide labels to bear precautionary statements when there is evidence of acute hazard to humans and requires the EPA to approve such labels when necessary. Monsanto had an obligation to provide the relevant data and ensure the approved label was complete.

20

Moreover, these arguments disregard the holdings in *Bates*. A verdict like the one at issue here, and in *Pilliod*, does not require Monsanto to place a cancer warning on Roundup, nor does any provision of FIFRA. Both state common-law and FIFRA require manufacturers of pesticides to include warnings necessary to protect human health, and FIFRA further requires them to inform the EPA if they learn of new information concerning a pesticide's risk after registration. (*Pilliod, supra,* 67 Cal.App.5th at p. 616; *Caranci, supra,* 338 A.3d at p. 170 ["FIFRA imposes additional requirements on manufacturers; in particular, it requires them not to sell pesticides without adequate health warnings"].) In our view, it is Monsanto that reads the relevant statutory provisions too narrowly.[6]

In sum, we decline to follow *Schaffner*. We instead follow the reasoning set forth in *Bates* and *Pilliod*, and, thus, are not persuaded that Dennis's claims are preempted by FIFRA.

## B.     The Punitive Damages Award Does Not Violate Due Process

Finally, we address Monsanto's assertion that the trial court erred by not concluding that the punitive damages award was excessive because it had already been sufficiently punished for its conduct.

"Well-established legal principles govern the award of punitive damages. 'Punitive damages are available where the plaintiff proves "by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice." (Civ. Code, § 3294, subd. (a).) "Malice" includes "despicable conduct which is carried on by the defendant with a willful and

---

6      Monsanto also asserts the state common-law requirement is different because it includes products that are used *or misused* in an intended or reasonably foreseeable way. But here, there is no evidence Dennis's claims were based on a misuse of Roundup.

21

conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).)' " (*Pilliod, supra,* 67 Cal.App.5th at p. 641.)

"Punitive damages are limited by principles of due process under the Fourteenth Amendment. [Citation.] 'An award of grossly excessive or arbitrary punitive damages is constitutionally prohibited because due process entitles a defendant to fair notice of both the conduct that will subject it to punishment and the severity of the penalty that may be imposed for the conduct.' " (*Pilliod, supra,* 67 Cal.App.5th at p. 642.) When addressing whether an award of punitive damages is constitutionally excessive, we apply a de novo standard of review but give deference to the jury and the trial court's factual findings. (*Simon v. San Paulo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172.)

As noted, here, the jury awarded $325 million in punitive damages, and the trial court reduced the award to $21 million. Monsanto asserts the reduced punitive damages award violates due process by punishing it multiple times for the same conduct. Monsanto does not raise any other arguments regarding due process or the sufficiency of the evidence supporting the malice finding or the award.

As the *Pilliod* court explained, "California courts have recognized that '[p]unitive damages previously imposed for the same conduct are relevant in determining the amount of punitive damages required to sufficiently punish and deter,' and that '[t]he likelihood of future punitive damage awards may also be considered, although it is entitled to considerably less weight.' " (*Pilliod, supra,* 67 Cal.App.5th at p. 649.) There, the court found "reprehensible conduct remains to be punished and deterred" because Monsanto continued to sell Roundup without a cancer warning. (*Ibid*.)

Here, Monsanto asserts the record establishes that it has ceased production of glyphosate-based products at least for the consumer market in the United States. Notably, though, Monsanto does not allege that it has ceased selling glyphosate-based products altogether, or that it has agreed to include a cancer warning on those that it does continue to sell. And, as particularly relevant here, Monsanto does not suggest that it has taken any steps to address its alleged interference with the development of the scientific analysis of its product, a significant basis for the punitive damages award in this case. Instead, and although it concedes that there was substantial evidence to support the jury's malice finding, Monsanto continues to assert that the evidence of the underlying science, and thus, its alleged malice, is "conflicting."

Monsanto relies primarily on *State Farm Mut. Auto Ins. Co. v. Campbell* (2003) 538 U.S. 408 (*State Farm*) to support its assertion, but *Campbell* is readily distinguishable here. In *State Farm*, the plaintiffs alleged State Farm ignored evidence and took their case to trial based on " 'a national scheme to meet corporate fiscal goals by capping payouts on claims company wide.' " (*Id.* at p. 415.) A jury awarded plaintiffs $2.6 million in compensatory damages and $145 million in punitive damages. (*Ibid.*) The trial court reduced the punitive damages award to $25 million but the Utah Supreme Court reinstated the original $145 million reward. (*Ibid.*)

In addressing the basis for that award, the United States Supreme Court noted that the Campbells had presented significant evidence of State Farm's conduct in other states, that at least some of the conduct was lawful where it occurred, and that "[a] State cannot punish a defendant for conduct that may have been lawful where it occurred." (*State Farm, supra,* 538 U.S. at pp. 420–421.) In that context, the court found that the punitive damages

award was meant "to punish and deter conduct that bore no relation to the Campbells' harm," (*id*. at p. 422) and that "[p]unishment on these bases creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains." (*Id*. at p. 423.)

Here, by contrast, the punitive damage award was based on Monsanto's "highly reprehensible conduct" directly related to Dennis's physical harm and suffering. Moreover, the trial court found that Monsanto was "a multibillion-dollar company which intentionally used its vast resources over several decades to protect its profits over the safety of ordinary consumers [like Dennis], showing a reckless disregard for the health and safety of the public." Nevertheless, it did reduce the punitive damages award significantly, ultimately "strik[ing] a balance, *including by taking into account the prior punitive damage awards* and Monsanto's subsequent actions."

Given the trial court's findings, we are not persuaded that the reduced punitive damages award violates Monsanto's right to due process.

## III.   DISPOSITION

The judgment is affirmed. Respondent is awarded costs on appeal.


KELETY, J.


WE CONCUR:


McCONNELL, P. J.


RUBIN, J.

24